The **LUBRIZOL CORPORATION**, Plaintiff,

v.

**EXXON CORPORATION**, Defendant.

No. C84–1064.

United States District Court,
N.D. Ohio, E.D.

June 17, 1988.

Jones, Day, Reavis & Pogue, Hal D. Cooper, Robert H. Hoerner, Kenneth R. Adamo, Robert Ducatman, Michael W. Vary, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for plaintiff.

Lawrence F. Scinto, Fitzpatrick, Cella, Harper & Scinto, New York City, George Karch, William Wallace, Thompson, Hine & Flory, Cleveland, Ohio, David B. Tulchin, Sullivan & Cromwell, New York City, for defendant.

## MEMORANDUM OF DECISION

BATCHELDER, District Judge.

On March 30, 1984, plaintiff the Lubrizol Corporation ("Lubrizol") commenced this action against defendant Exxon Corporation ("Exxon") alleging that certain products manufactured by Exxon infringe a number of Lubrizol patents, including U.S. Patent 4,234,435 (the "435 Patent"). On April 25, 1988, Lubrizol filed a motion seeking a preliminary injunction to enjoin Exxon from selling any lubricating composition or additive which contains an Exxon product known as ECA 10444 which Lubrizol claims to infringe the '435 Patent.

## I. FINDINGS OF FACT

### BACKGROUND

Lubrizol is an Ohio corporation with its principal place of business in Wickliffe, Ohio. Exxon is a Delaware corporation with its principal place of business in New York, New York. The lubricating oil additive products at issue in this case are manufactured by the Paramins Division of Exxon Chemical Corporation, a division of Exxon Corporation. Exxon Company U.S.A., also a division of Exxon, sells finished lubricants which contain the additive products manufactured by the Paramins Division.

Lubrizol and Exxon are competitors in the sale of lubricating oil additive products. These additive products are sold to customers who blend them into their basestock

oils to make finished lubricating oils. Lubrizol, unlike many of its competitors, including Paramins, is not affiliated with an oil company. Rather, Lubrizol purchases petroleum-related raw materials from oil companies to use in manufacturing its lubricating oil additives.

Lubricating oil additives are products which provide the necessary lubricating function in motor oils. Lubrizol and Exxon not only compete with one another in the manufacture and sale of such lubricating oil additives but are the two largest companies involved in the lubricating oil additive industry.

Lubricants marketed in the United States bear designations signifying qualification under standards promulgated by the American Petroleum Institute ("API"). On March 4, 1988, the API promulgated new standards for motor oils: "SG" for passenger car motor oils and "CE" for diesel motor oils.

Lubricating oil additive customers normally are reluctant to change from one lubricating oil additive supplier to another in the absence of a change in API standards, such as the newly announced SG and CE standards. A change from one supplier to another may require that the customer clean its storage tanks, design new formulation sheets, and install new or different metering devices. As a result, the market share of each lubricating oil additive supplier tends to stay relatively static between changes in API standards.

The specifications announced by the automobile manufacturers state that either the SG or the old SF standard oil may be used in the 1989 model year automobiles which will be released later this year. However, all 1990 model year automobiles must use the new SG standard oil. To remain competitive, all lubricating oil suppliers must reformulate their oils to meet the new SG and CE standards within the next four to six months. Currently, existing purchaser-supplier relationships have been and are likely to be severed as each oil company attempts to meet the new SG standard with the lowest possible formulation cost and the best performance package. As a result, the entire market for lubricating oil additives is in a great state of flux. The supplier that can meet the new standards at the lowest cost will have a significant advantage in the competition to retain and/or increase market share.

Additives incorporated in a finished lubricant include detergent inhibitor ("DI") packages and, where a multigrade lubricant is involved, viscosity index ("VI") improvers, also called viscosity modifiers ("VM"). A typical DI package will usually contain a dispersant, a detergent, an oxidation inhibitor and various other components such as an anti-wear component, all of which aid in either preventing or controlling the formation of undesirable products in the engine due to the internal combustion process. A dispersant helps keep the engine clean by keeping dirt and other particles in suspension in the motor oil to prevent their being deposited and baked on piston walls as "varnish," or on internal engine surfaces as "sludge." A viscosity modifier helps to increase the viscosity of the lubricant in hot weather or at high operating temperatures while lowering the viscosity in cold weather and prior to engine warm-up.

Lubricant sellers place these additives in lubricating oils based on "treat rate," which is the amount of the particular additive necessary to reach the desired result. In the instant case, meeting the SG standard is the desired result. "Treat cost" is the amount of additive needed to reach the desired result multiplied by the cost of such additive. "Total formulated cost" is the sum of the individual costs of each of the components of that particular finished lubricant.

## THE '435 PATENT

The subject of this preliminary injunction hearing is the United States Letters Patent No. 4,234,435, (the "435 Patent") issued on November 18, 1980, to Norman A. Meinhardt and Kirk E. Davis and assigned to The Lubrizol Corporation. The title of the invention set forth therein is "Novel Carboxylic Acid Acylating Agents, Derivatives Thereof, Concentrate and Lubricant Com-

positions Containing the Same and Processes for Their Preparation."

In general terms, the '435 Patent claims lubricating compositions containing dispersants derived from high molecular weight hydrocarbons. The dispersants are useful *per se* as lubricant additives; they also may be subjected to post-treatment with other compounds or compositions to produce other derivatives which are useful as lubricating additives. Further, the '435 Patent discloses that these dispersants must contain three key parameters which define the invention. First, the starting polyisobutylene (a species of polyalkene) must have a number average molecular weight ("$M_n$") of from 1300 to about 5000. Second, the starting polyisobutylene must have a distribution of molecules such that the ratio of weight average molecular weight ("$M_w$") to number average molecular weight ("$M_w/M_n$") of such molecules is in the range of about 1.5 to about 4.

The third key parameter relates to the product obtained when the starting polyisobutylene is reacted with maleic anhydride, another starting material, to produce a substituted succinic acylating agent which Exxon refers to as "PIBSA", and Lubrizol refers to as "Pbu Succan." This substituted succinic acylating agent contains the reacted polyisobutylene, now a polyisobutenyl substituent group, and the reacted maleic anhydride, which the '435 Patent refers to as a "succinic group." The reaction process is referred to as "succination" because it results in the formation of succinic groups which bond to the starting polyisobutylene. The completed reaction yields a product with three basis components: 1) unreacted polyisobutylene; 2) unreacted maleic anhydride; and 3) starting polyisobutylene which has bonded with one or more succinic groups ("PIB(SA)$_n$" or "Pbu(Succan)$_n$", where "n" represents the number of succinic groups which have bonded with a starting polyisobutylene.)

The third key parameter of the '435 Patent teaches that the ratio of succinic groups to substituent groups must be at least 1.3. When the ratio is greater than 1.0 the reaction product is referred to as "over-succinated," since there are more succinic groups than substituent groups present. The ratio of succinic groups ("(SA)" or "(Succan)") to polyisobutenyl groups in the resulting product is referred to as the "succination ratio" by Lubrizol. "Polyisobute*nyl*", as opposed to "polyisobute*ne*" or "polyisobute*ne*", indicates a polyisobutene that has reacted with something else, such as a succinic group. "Functionality" is a term used by Exxon to represent the ratio of succinic anhydride groups to units of starting polyalkene. Although these terms were occasionally used interchangeably throughout the hearing, on the whole, Exxon persisted in using the term functionality while Lubrizol spoke in terms of succination ratio. Moreover, while there is clearly a technical distinction between these terms, for the purpose of much of what developed at the hearing the distinction between the two was a distinction without any practical difference. Neither term appears within the '435 Patent.

## INFRINGEMENT

Exxon's Paramins Division markets two series of DI packages, Paranox 600 and Paranox 300, which contain a high molecular weight, over-succinated acylated amine lubricating concentrate known as ECA 10444. Exxon Company, USA markets a finished lubricant, "Superflo High Performance," which also contains ECA 10444. In the instant action, Lubrizol alleges that Exxon's ECA 10444 infringes claims 1 and 35 of the '435 Patent when used to formulate a finished lubricant and claim 41 when used in concentrate form.

There are three key elements of the carboxylic derivative compositions set forth in claims 1, 35, and 41 of the '435 Patent:

1. The polyalkene from which the substituted succinic acylating agent is derived must have a $M_n$ of about 1300 to about 5000;

2. The polyalkene must have a $M_w/M_n$ ratio of about 1.5 to about 4.0; and

3. The ratio of succinic groups to substituent groups must be at least 1.3.

Exxon does not dispute that its intermediate PIBSA 54, from which ECA 10444 is made, falls within the parameters of elements one and two above. The sole factual issue before this Court on the issue of infringement is whether the PIBSA 54, from which ECA 10444 is made, has a ratio of succinic groups to substituent groups of at least 1.3, and more specifically, whether the unreacted polyisobutylene is included or excluded when determining the number of substituent groups. Both parties agree that unreacted polyisobutylene is present in the reaction mixture after the polyisobutylene is reacted with maleic anhydride. Exxon contends that the unreacted polyisobutylene should be included in the calculation while Lubrizol contends that the unreacted polyisobutylene should be excluded. Under Exxon's method of calculation, (which results in a determination of functionality,) PIBSA 54 has a ratio of 1.13 succinic groups per polyisobutylene. Under Lubrizol's method of calculation, (which results in a determination of the succination ratio,) PIBSA 54 has a ratio of succinic groups to reacted polyisobutylene, or polyisobut*enyl* substituent of 1.43.

### Analysis of the Claims of the '435 Patent

Claim 1 of the '435 Patent provides in pertinent part:

A lubricating composition comprising a major amount of oil of lubricating viscosity and a minor amount of one or more carboxylic derivative compositions produced by reacting at least one *substituted succinic acylating agent* with a reactant ... wherein *said substituted succinic acylating agents consist of substituent groups and succinic groups* wherein the *substituent groups are derived from polyalkene*, said polyalkene being characterized by a $M_n$ value of 1300 to about 5000 and a $M_w/M_n$ value of about 1.5 to about 4, said *acylating agents being characterized by the presence within their structure* of an average of at least 1.3 succinic groups for each equivalent weight of substituent groups.

('435 Patent, Px. 1 col. 52, 11. 34–54) (emphasis added). Claims 35 and 41 refer to Claim 1 when describing a "carboxylic derivative composition" ('435 Patent, Px. 1 col. 56, 11. 2–3, col. 57, 11. 45–46).

1. "Carboxylic derivative compositions produced by reacting at least one *substituted succinic acylating agent* with a reactant."

An acylating agent is a molecule that introduces into another molecule an acyl group or acyl radical. An acyl group is composed of a carbon atom double bonded to an oxygen atom. Polyisobutylene does not contain an acyl group. Therefore, polyisobutylene, and more specifically the unreacted polyisobutylene present in the aforementioned reaction mixture cannot be an acylating agent.

2. "Said substituted succinic acylating agents consist of *substituent groups* and *succinic groups*."

The succinic groups described in the '435 Patent are such that they may be represented by Formula I, Formula II, and Formula III as set forth therein ('435 Patent, Px. 1 col. 6, 11. 1–6; col. 8, 11. 36–42, 52–61). Polyisobutylene, and more specifically the unreacted polyisobutylene present in the reaction mixture, is not a succinic group nor does it contain a succinic group.

A "substituent," as that term is ordinarily and customarily used, is an atom or group of atoms which replaces another atom or group of atoms in a molecule as the result of a reaction. By definition, polyisobutylene, and more specifically the unreacted polyisobutylene present in the reaction mixture cannot be a substituent since it has not replaced an atom or group of atoms in a molecule as a result of a reaction.

Moreover, neither the claims of the '435 Patent nor the specification or examples contained therein ascribe a different meaning to the phrase "substituent group." Claim 1 provides that "the substituent groups are derived from polyalkene" ('435 Patent, Px. 1, col. 52, 1. 48). In addition, the specifications of the '435 Patent teach that the substituent groups are "derived from polyalkene" ('435 Patent, col. 5, 1. 60;

col. 6, 1. 55–56; col. 7, 1. 2–3; col. 9, 1. 35–36; col. 10, 1. 13–16; col. 10, 1. 58–60). The starting polyalkene for PIBSA 54 is polyisobulylene. Thus, the unreacted polyisobutylene present in the reaction mixture is not "derived from polyalkene"; it is simply the starting polyalkene (polyisobutylene) which has not reacted.

3. "Said acylating agents being characterized by the *presence within their structure* of an average of at least 1.3 succinic groups for each equivalent weight of substituent group."

From the foregoing, it is clear that polyisobutylene and the unreacted polyisobutylene present in the reaction mixture are neither acylating agents, succinic groups, nor substituent groups. As a result, they cannot be "present within the structure" of the acylating agents described in the '435 Patent.

The specification provides that the substituted succinic acylating agents described in the '435 Patent are characterized by the presence within their structures of an average of at least 1.3 succinic groups for each equivalent weight of substituent group (Px. 1 col. 3, 11. 59–61). The specification further provides that the substituted succinic acylating agents can be represented by the symbol:

$$R_1 - (R_2)_y$$

where $R_1$ represents one equivalent weight of substituent group; $R_2$ represents one succinic group; and y is a number equal to or greater than 1.3 (Px. 1 col. 9, 11. 13–23).

Exxon argues that since y is an average,[1] it is possible for y to equal 0 in any particular case, which would indicate that the starting polyisobutylene had not reacted. This construction is not possible when viewed in light of what the symbol is intended to represent and the plain and ordinary meaning given to each component. The symbol represents substituted succinic *acylating agents*. It has already been established that unreacted polyisobutylene is not an acylating agent. Moreover, $R_1$ is defined as one equivalent weight of *substi-*

*tuent group.* Once again, it has already been established that unreacted polyisobutylene is not a substituent.

Finally, the specification teaches that "while the products of this invention are clearly substituted succinic acylating *agents ...*, their structures cannot be represented by a single chemical formula. In fact *mixtures of products* are inherently present." ('435 Patent, Px. 1 col. 18, 11. 15–19). Exxon posits that "mixtures of products" presumably includes unreacted polyisobutylene. Once again, this construction is contrary to the plain meaning of the words contained within the phrase. First, this phrase defines the term "products" as substituted succinic acylating agents. When polyisobutylene is reacted with maleic anhydride as described in the '435 Patent, some polyisobutylene will not react and some may bond with one or more succinic groups. The polyisobutylene that has not reacted is not an acylating agent. The polyisobutylene that has bonded with one or more succinic groups is an acylating agent and may be represented by the formula: "PIB(SA)$_n$," or "Pbu(Succan)$_n$," where n is a number greater than or equal to one and represents the number of succinic groups which have bonded with one equivalent weight of substituent. Each of these acylating agents, *i.e.,* PIB(SA)$_1$, PIB(SA)$_2$, PIB(SA)$_3$, ... PIB(SA)$_n$, is represented by a different chemical formula; the presence of more than one of these acylating agents constitutes a mixture; and, when the average value of n for any given mixture is at least 1.3, products or acylating agents described in the '435 Patent are present. Thus, the terms "products" and "mixture" do not include unreacted polyisobutylene.

4. The examples set forth in the '435 Patent

Example 1 of the '435 Patent (Px. 1 col. 45, 11. 23–34) provides, in essence, that a mixture of polyisobutene and maleic anhydride is heated for a period of time during

---

1. *See* Claim 1 of the '435 Patent, col. 52, 11. 51–54. "... said acylating agents being characterized by the presence within their structure of an average of at least 1.3 succinic groups for each equivalent weight of substituent group."

which chlorine gas is added.[2] The reaction mixture is then stripped of excess maleic anhydride with nitrogen blowing. Example 1 then concludes that "the residue is the desired polyisobutene-substituted succinic acylating agent having a saponification equivalent number of 87 as determined by ASTM procedure D–94" (Px. 1 col. 45, 11. 31–34).

Exxon contends that since unreacted polyisobutene is inherently present in the reaction mixture, and since the "residue" is described as "the desired polyisobutene-substituted succinic acylating agent," that the acylating agent must therefore include unreacted polyisobutene, and more specifically that the unreacted polyisobutene must be included when calculating the ratio of succinic groups to substituent groups. Thus, Exxon's entire argument turns on the use of the word "is" in the phrase "the residue *is* the desired ... acylating agent." Indeed, Exxon concedes that had the word "contains" been used in place of "is," its position could not be supported.

The Court cannot agree with Exxon's interpretation. When the polyisobutene and maleic anhydide are placed into a mixture, the resulting reaction mixture contains unreacted polyisobutene and unreacted maleic anhydride. While it is necessary and economically feasible to "strip" or remove the unreacted maleic anhydride, it is neither necessary nor economically feasible to strip the unreacted polyisobutene. As a result, inert materials, such as unreacted polyisobutene are present in the residue. While the examples refer generally to the residue or the filtrate as the desired acylating agent, they do not alter the specific requirement of the specification or the third key element of Claim 1: that the acylating agents be characterized by the presence within their structure of an average of at least 1.3 succinic groups for each equivalent weight of substituent groups. Unreacted polyisobutene is not present within the structure of the acylating agent, neither is it a succinic group or a substituent group.

However, were the Court to accept Exxon's assertion that the use in Example 1 of the phrase "... residue is the ... acylating agent" mandates the inclusion of the unreacted polyisobutylene in the acylating agent, it still could not accept Exxon's conclusion that the unreacted polyisobutylene must be included when calculating the ratio of succinic groups to substituent groups. The specification, excluding the examples, provides that the acylating agents are characterized by the presence within their structures of an average of at least 1.3 succinic groups for each equivalent weight of substituent group (Px. 1 col. 3, 11. 58–61; col. 4, 11. 16–18; col. 9, 11. 13–22). This definition of the term "acylating agents" is consistent with the definition contained in the claims of the '435 Patent. (Px. 1 col. 52, 11. 47–55). Thus, regardless of whether the acylating agent in the examples is *construed to include* unreacted polyisobutylene, the acylating agents defined in the claims and in the specification must still contain an average of at least 1.3 succinic groups per equivalent weight of substituent group. Nothing in the examples alters the clear and unambiguous meaning of the terms "succinic group" and "substituent group" as they are used throughout the claims, the examples and the remainder of the specifications, and a thorough review of all of the evidence before this Court clearly establishes that unreacted polyisobutylene is neither a succinic group nor a substituent group.

Finally, the parties agree that by including the unreacted polyisobutylene when calculating the ratio of succinic groups to substituent groups, the resulting ratio will always be smaller than when the unreacted polyisobutylene is not included. For example, a ratio of 1.3, calculated by including unreacted polyisobutylene, will always exceed 1.3 if the unreacted polyisobutylene is excluded from the calculation.

Without excluding the unreacted polyisobutylene prior to calculating the ratio in each example of the '435 Patent, the resulting ratio is greater than 1.3 in each exam-

---

2. Although Example 1 has been singled out for the purpose of this section of the analysis, this analysis applies as well to the remainder of the examples set forth in the '435 Patent.

ple. As a result, it cannot be disputed that had the unreacted polyisobutylene been excluded from these calculations the resulting ratio would have been higher. Since each of the examples contains the parameters of Claim 1 of the '435 Patent without excluding the unreacted polyisobutylene, there was no need to determine and back out the quantity of unreacted polyisobutylene before calculating the ratio.

Thus, the Court finds that the examples of '435 Patent do not ascribe a different meaning to the "acylating agents" (*ie.*, that the "acylating agent" includes unreacted polyisobutylene) from the meaning ascribed to that term throughout the claims and the remainder of the specification, and that, even if the examples could be read to do so, the acylating agents must still be characterized by the ratio of 1.3 succinic groups for each equivalent weight of substituent groups; that the examples do not alter or remove this requirement, nor do they ascribe to the terms "succinic group" and "substituent group" a different meaning from that used throughout the '435 Patent, which is consistent with the ordinary and accustomed meaning of those words; that unreacted polyisolutylene is neither a "substituent group" nor a "succinic group," nor is it "derived from a polyalkene"; that unreacted polyisobutene is *not* to be included in calculating the ratio of succinic groups to equivalent weight of substituent groups; that by excluding the unreacted polyisobulylene when calculating the ratio of succinic groups to equivalent weight of substituent group for the PIBSA/PAM in ECA 10444 the resulting ratio is 1.43 and therefore falls within the literal scope of the asserted claims of the '435 Patent; that Paranox 300 and Paranox 600 fall within the scope of claim 41 because they contain ECA 10444 and are concentrates for formulating lubricating compositions and when used in lubricating compositions fall within the scope of claim 1 and, in addition, claim 35 because ECA 10444 is borated; that Superflo High Performance itself falls within the scope of claim 1 of the '435 Patent because it contains ECA 10444, and is a lubricating composition; and that Superflo High Performance also falls within the scope of claim 35 because it is a lubricating composition which contains ECA 10444, in which the carboxylic derivative composition is post-treated with boric acid.

## VALIDITY

Exxon defends against the demand for injunctive relief by challenging the validity of the '435 Patent on the basis of the prior art. Specifically, Exxon claims that the invention of the '435 Patent was anticipated by and/or was obvious in light of numerous patents already issued and two products already on the market at the time that the application for this patent was filed.

Crucial to Exxon's claims of anticipation and obviousness is the contention that the terms "molecular weight" and "average molecular weight," whenever used in any of the patents, including the '435 Patent, mean, and would have meant, *number average* molecular weight to anyone of ordinary skill in the art in 1977 or at any other relevant time. The Court finds that Exxon has not established by clear and convincing evidence that this contention is correct and, indeed, from the evidence thus far presented, the Court finds that it is not correct.

### *Anticipation*

■ Turning first to the facts relevant to the defense of anticipation, it is clear that at least one of the products on which Exxon relies, viz. Lubrizol's LZ570, had been "on sale" for more than one year prior to the date of the filing of the '435 Patent application. (It is far from clear that the other product, LZ572, had been on sale for the requisite time.) However, the Court finds that the evidence adduced at the hearing does not establish that either LZ570 or LZ572 was a product which falls within the claims of the '435 Patent. LZ570 and LZ572, although containing substituted succinic acylating agents which Exxon claims meet the requirements of those defined by the '435 Patent, are not lubricating compositions and, indeed, these products contain materials which would preclude their being used as lubricating compositions. Furthermore, in part due to

the finding in regard to the meaning of "molecular weight," the Court finds that the evidence does not clearly demonstrate that the acylating agents contained in these products in fact contain all of the key parameters of the '435 Patent.

■] An examination of the patents cited by Exxon as prior art similarly reveals that none of those patents has been shown to contain each element of the '435 Patent. Exxon's presentation at the hearing did not clearly identify which of these patents it views as anticipating the patent in suit, although it did specifically refer to the '484 Patent in relation to LZ570. For this reason, the discussion of the subject matter of each of those patents is undertaken in the context of the claims of obviousness. Neither has the evidence presented by Exxon substantiated its contention that the actual claims of the '435 Patent are the over-succinated acylating agents themselves, rather than, as the clear language of the patent states, the lubricating compositions containing those agents.

■ Finally, the evidence presented by Exxon does not demonstrate that the invention of the '435 Patent is nothing more than an active ingredient plus a diluent combined to form a composition which is identical to that found in a prior art reference wherein the diluent and the end use only are different. Specifically with reference to the '484 Patent and LZ570, even if the acylating agents in the dispersants of those references had been clearly demonstrated to contain the parameters of the '435 Patent (which they have not been) those dispersants have not been shown to function in refinery feed streams as the dispersants in the '435 Patent function in lubricating oils, i.e. to impart significant viscosity-modifying benefits in addition to their dispersant effects.

### Obviousness

■ The analysis of the obviousness issue is considerably more complex, since the Court must determine the scope and content of the prior art, the differences between that prior art and the claims at issue, and the level of ordinary skill in the pertinent art. The parties in the instant matter do not dispute that the level of ordinary skill at issue here is "equivalent to a Ph.D. [presumably in Chemistry] and several years of experience, or a Bachelor's or Master's Degree in Chemistry or Chemical Engineering and perhaps five or more years experience ..." as testified to by Exxon's expert Dr. Klaus. It is the task of this Court, which has nothing approaching that level of skill in the art, to determine whether Exxon has presented sufficient clear and convincing evidence that in 1977, when the application for the patent in suit was filed, the claimed invention would have been obvious to one possessing that requisite level of skill, in light of the prior art, to preclude Lubrizol from sustaining its burden of demonstrating a likelihood of succeeding on the merits on the issue of validity of the '435 Patent. Thus, the facts relevant to the issue of obviousness concern the scope and content of the prior art references, and the differences between each of those prior art references and the claims of the '435 Patent.

Exxon has cited as prior art references and has presented testimony and evidence relative to five patents, viz. 3,927,041, 3,235,484, 3,172,892, 3,632,510, 3,576,743. In addition, Exxon marked as exhibits and submitted to the Court, without testimony or comment, seven patents (DXs 100, 101, 102, 104, 105, 106 and 107), which are alleged to be prior art in the light of which the '435 Patent would have been obvious. (Although Exxon's exhibits, trial testimony and proposed findings make reference to one additional patent, the Okamoto '056 Patent, only the Okamoto '341 was provided to the Court by Exxon.) A careful review of the '435 Patent reveals that each of these patents except the '041 appears by specific citation in the '435 Patent, and was thus before the patent examiner. Turning first to those prior art references provided by Exxon without specific testimony relative to their scope and relationship to the patent in suit, the Court finds as follows:

DX 100, is a patent held by the Lubrizol Corporation, United States Patent, 3,231,-587, claiming an improved process for mak-

ing light-colored substituted succinic acid compounds. This patent does not claim any new compound, but rather a process which more efficiently produces hydrocarbon substituted succinic acid compounds, thus rendering them more commercially useful and, because the compounds produced by this process are of a light color, more appealing as well. Although claim six of the patent involves the use of polyisobutene having a molecular weight within the range of from about 500 to about 3,000 and claim seven involves the use of a polyisobutene having a molecular weight of about 1,000, neither the claims, the specifications nor the examples refer specifically to number average molecular weight, the ratio between weight average and number average molecular weight or the degree of succination of the resulting product.

DX 101, United States Patent 3,288,714, claims lubricating oil compositions containing alkenyl succinic anhydrides, and specifically claims, *inter alia,* a lubricating oil composition containing polybutenyl succinic anhydride derived from polybutene with a molecular weight of 1500. The specific kind of molecular weight is not indicated, and no mention is made in this patent of number average molecular weight of the hydrocarbons used, the weight average to number average molecular weight ratio, or the degree of succination of the alkenyl succinic anhydrides. This patent does make mention of the fact that the reaction between the olefin polymer and the maleic anhydride may not go to completion and thus the resulting alkenyl succinic anhydride may contain some unreacted olefin polymer which may be allowed to remain in the product since it has no undesirable effects.

DX 102, a British Patent 1 440 219, claims a process for production of alkenyl succinic anhydrides as well as a lubricating composition containing those alkenyl succinic anhydrides. This patent makes no reference to number average molecular weight, the weight average to number average molecular weight ratio or the degree of succination of the reaction product of the claimed process. Interestingly, this patent, the application for which was filed

in 1973, specifically notes that the product obtained in example one of the specifications contained 31.1% of unreacted polyisobutene, a clear indication that, contrary to Exxon's contentions, at least some of those skilled in the art at that time were able to determine the amount of unreacted polyisobutene in polyisobutenyl succinic anhydride.

DX 104, United States Patent 3,219,666, is another Lubrizol patent which claims oil soluble acylating nitrogen compositions for use as dispersants in lubricating oils. While this patent specifies that a critical aspect of the invention is the size of the substantially hydrocarbon substituent in the acylated nitrogen compounds, the patent contains no reference to number average molecular weight, the weight average to number average molecular weight ratio or the degree of succination of the polyisobutenyl succinic anhydrides suggested for use by the examples. The specifications of this patent note that the use of olefin polymers having molecular weight of about 750 through 5000 is preferred and that higher molecular weight olefin polymers having molecular weights from about 10,000 to about 100,000 have been found to impart viscosity index improving properties to the acylated nitrogen compounds of the invention. Col. 3 1. 71 through Col. 4 1. 1.

DX 105, United States Patent 3,950,341, the first Okamoto Patent and the only one provided to the Court by Exxon, claims dispersants containing polyalkenyl succinic acid or its anhydride for use in hydrocarbon oils and oxygen-containing synthetic oils. This patent makes no mention of number average molecular weight, weight average to number average molecular weight ratio, or degree of succination of the polyalkenyl succinic anhydride. Example one of this patent, which Exxon claims contains a polyisobutenyl succinic anhydride within the claims of the '435 Patent does not in fact specify any of the parameters of the '435 Patent.

DX 106, United States Patent 3,284,410, another Lubrizol patent, claims Boron-containing compositions for use in lubricating oils and the process for preparing those

compositions. This patent again utilizes hydrocarbon-substituted succinic acid compounds, but the patent makes no mention of number average molecular weight, weight average to number average molecular weight ratio or succination ratio of the acylating agents.

DX 107, United States Patent 3,024,237, claims nitrogen-substituted alkenyl succinamide compounds for use in lubricating oils. While this patent professes to be the first which utilizes the reaction product obtained from reacting a high molecular weight olefin (from about 400 to about 3000) and maleic anhydride, nothing in the patent suggests that the number average molecular weight, the weight average to number average molecular weight ratio or the degree of succination of the reaction product are critical. It is interesting to note, however, that at Col. 3 1. 10–19, the specifications note that the reaction between the polyolefin and maleic anhydride may not go to completion and the resulting alkenyl succinic anhydride may contain some unreacted polyolefin which, if desired, can be removed by precipitation.

Not one of these prior art references suggest that any particular $M_n$, $M_w/M_n$ or succination ratio of the substituted succinic acylating agents utilized in the dispersants is significant, nor is there any suggestion in any of these patents that an acylating agent which contained the particular parameters of the agent in the patent in suit might be expected to have any viscosity-modifying properties. In fact, as noted above, the '714 Patent specifically notes at Col. 3 1. 43–51 that the products of that invention frequently require the addition of viscosity index improvers, and the '666 Patent notes that olefin polymers having molecular weights from about 10,000 to about 100,000, far in excess of the molecular weights of any kind specified in the patent in suit, have been found to impart viscosity index improving properties. Thus, although each of the patents relates to the general subject matter of substituted succinic acylating agents, and several of those patents relate to the use of those agents in lubricating oils or the processes for preparing those agents and/or lubricating compositions containing them, each of those patents specifically differs from the claims of the patent in suit in that the parameters of the patent in suit are neither specified nor suggested in the prior art references nor is the viscosity modifying property of the acylating agents defined by the patent in suit specified in or suggested by any of those references.

Exxon specifically cited and presented testimony and evidence relative to five patents. Analysis of the scope and content of those prior art references leads to the following findings:

The '041 Patent, occasionally referred to during the proceedings as the Standard Oil Patent, claims the method of preparing an alkenyl-succinic anhydride utilizing a butene polymer having a $M_n$ in the range of 300 to 3000, and the method of preparing an alkenyl-succinic anhydride utilizing a butene polymer having an $M_n$ of about 900 to about 950. The specifications of the patent indicate that the intended use of the products prepared by the claimed methods is as detergent-dispersants in lubricating oils. While the patent is specific as to $M_n$, no reference appears to $M_w/M_n$ nor is any reference made to the succination ratio of the alkenyl-substituted anhydride. The patent does however indicate at Col. 6, 1. 12–16, that the unreacted polybutene component was determined for calculation of reacted polybutene by column chromotography and the yield of polybutenyl succinic anhydride is noted as being reported as "percent yield" on a "stoichiometric basis taking into account unreacted maleic anhydride and unreacted polybutene." No indication appears, however, that any particular relationship between the polybutenyl substituent and the succinic group is of any significance. Neither does this patent specify or suggest any relationship between the $M_n$, $M_w/M_n$ and succination ratio, and the viscosity index improvement properties of the products, if any.

The '484 Patent, which is the Colfer Patent whose application was co-pending with the application of W.M. Le Suer for the '892 Patent, incorporates into the patent the oil soluble acylated amine of

the '892 Patent. The '484 Patent claims methods for inhibiting the accumulation of carbonaceous materials in refinery cracking units, and while the specifications require a hydrocarbon substituent which is large, the stated reason relates to the ability to inhibit accumulation of carbonaceous material in refinery cracking units. No indication appears in this patent that the acylating agents utilized in this patent would be used in lubricating oils. Example six of the '484 Patent, on which Exxon depends in its contention that this patent rendered the '435 Patent obvious, contains an acylating agent which arguably falls within the parameters of the '435 Patent, but that acylating agent is used in a refinery feed stream, and not in a lubricating composition. Furthermore, although the acylating agent of Example six might be an over-succinated material, the specifications of the patent clearly are directed to mono-suceinated materials. The patent itself makes no mention of the parameters specified in the '435 Patent, viz. $M_n$, $M_w/M_n$, or succination ratio, and the patent neither specifies nor suggests that the use of this acylating agent in a lubricating composition might impart viscosity improvement benefits.

The '892 Patent, the application for which was co-pending with the '484 Patent, is a W.M. Le Suer patent assigned to the Lubrizol Corporation and claims both the product and the process for preparing the product obtained by reacting hydrocarbon-substituted succinic compounds with ethylene amine, for use in lubricating oils. The specifications of this patent indicate that polyisobutylene having a molecular weight of 750 is a particularly preferred polyolefin because of its economic availability and the effectiveness of products prepared from it. The specifications further indicate that an important aspect of the invention of this patent lies in the discovery that the size of the copolymer substituent group in the substituted succinic anhydride should be large, *i.e.* about 50 carbon atoms, in order to incorporate the new property of dispersancy into the composition. There is, however, no reference in the patent to $M_n$, $M_w/M_n$ or succination ratio, and the polyisobutylene

of the various examples ranges in average molecular weight from 375 to 50,000. As in the '484 Patent, the specifications are directed toward monosuccinated materials. Nothing in this patent specifies or suggests that the products claimed or the products resulting from the process claimed in this patent would have, in addition to dispersant effects in lubricating oil, any effect on viscosity.

The '743 Patent, another Lubrizol patent, claims a process for preparing oil soluble compositions containing the reaction product from reacting a high molecular weight polycarboxylic acid acylating agent, first with a polyhydric alcohol and then with a hydroxy substituted primary amine, for use as lubricant and fuel additives; the patent also claims the products of this process and lubricants or fuels in which the products are used. Although this patent utilizes in one of its examples a polyisobutylene having an average molecular weight of about 2,000, there is no reference in the patent to $M_n$, $M_w/M_n$, or succination ratio of the acylating agent. Further, although the oil soluble compositions claimed in this patent are to be used in lubricating oils for their dispersant effects, and the patent claims lubricants or fuels incorporating a dispersant amount of the oil soluble compositions claimed, nothing in this patent specifies or suggests any viscosity index improvement benefits to be expected from the products claimed.

The '510 Patent, another Lubrizol patent, claims mixed estermetal salts derived from hydrocarbon-substituted succinic acid wherein the hydrocarbon substitutents include principally the high molecular weight polyolefins, having average molecular weights of about 700 to 5,000. The specifications of the patent note that higher molecular weight olefin polymers having average molecular weights from about 10,000 to about 100,000 or higher have been found to impart viscosity index improving properties to the final products of this invention. The invention further claims the lubricating and fuel compositions which contain the claimed mixed ester-metal salts, and the usefulness of the claimed compositions is

as plasticizers, detergents, antitrust agents, emulsifiers, and additives in lubricating compositions, fuels, hydrocarbon oils, and power transmitting fluids. The patent makes no reference, either in its claims, specifications or examples, to $M_n$, $M_w/M_n$, or succination ratio, and nothing in the patent either specifies or suggests that the products claimed have or would be expected to have any viscosity improving effect.

Thus, it is apparent that each of the prior art patents cited by defendant Exxon in support of its contention that the '435 Patent is invalid because of obviousness, differs from the claims of the '435 Patent in that the '435 Patent claims lubricating compositions or concentrates for formulating lubricating compositions incorporating the dispersants derived from reacting the acylating agents whose parameters are that the starting polyalkenes from which they are derived have a $M_n$ value of about 1,300 to about 5,000 and a $M_w/M_n$ value of about 1.5 to about 4, and which acylating agents have a succination ratio as hereinbefore defined of at least 1.3, which dispersants, when incorporated into a lubricating composition, impart, in addition to their dispersant capabilities, a viscosity index benefit.

Central to Exxon's claim that the cited prior art references would have rendered the claims of the '435 Patent obvious in 1977, is Exxon's contention that "molecular weight" and "average molecular weight" mean *"number* average molecular weight." Using this assumption, Exxon was able to calculate succination ratios for acylating agents found in some examples of some of the prior art patents. This Court finds that Exxon has not demonstrated by clear and convincing evidence that this assumption is correct, and indeed, the Court has found from the evidence presented that it is not correct. Accordingly, the Court cannot find that Exxon has demonstrated that the succination ratios calculated by Exxon are correct. Further, the Court cannot find that the polyisobutenes described in the prior art patents fall within the $M_n$ value of about 1,300 to about 5,000, since the molecular weight specified in the patents for those polyisobutenes is not specified to be number average molecular weight. Further, the Court finds that none of the polyisobutenes in the prior art patents cited and discussed by Exxon disclose the $M_w/M_n$ ratio. Therefore, the Court finds that none of the references cited by Exxon taught the three critical parameters of the '435 Patent.

An examination of all of the prior art references submitted by Exxon, those as to which Exxon presented testimony, and those as to which only the patents were submitted to the Court, reveals that although all of these patents, as well as LZ 570 and LZ 572 are relevant prior art, and all of these patents and products relate in one way or another to hydrocarbon-substituted succinic acylating agents, to a significant extent, each represents a development in the use of, preparation of, process for preparation of, or refinement of the use of hydrocarbon-substituted succinic acylating agents. The Court finds that the '435 Patent is simply one more such patent, and the evidence presented by Exxon does not establish clearly and convincingly that a combination of the teachings in any of these prior art references individually or all of them collectively would have implied or expressly suggested that the utilization of polyisobutenyl succinic anhydride containing the parameters set forth in the '435 Patent in a lubricating composition would have resulted in the highly efficient dispersant properties combined with the viscosity index improvement properties which this acylating agent imparts.

■ Analysis of obviousness requires that, in addition to determining the scope and content of the prior art, and the ways in which it differs from the patent in suit, the Court must also look to the secondary considerations, such as evidence of commercial success, the filling of a long-felt need in the industry, and the copying of the patent by one challenging that patent. The evidence presented at the hearing on the motion for preliminary injunction clearly indicates that the accused Exxon products have been and continue to be commercially successful. Furthermore, the Exxon ECA 10444 was shown by the evidence to be a

more efficient dispersant than its predecessor, ECA 5025, which is not alleged to infringe the '435 Patent. Probably the clearest evidence of the commercial success of ECA 10444 is Exxon's dire prediction of the effect on Paramins in particular and the additive market in general should the injunction sought by Lubrizol actually issue. While the need for efficient dispersants at lower costs certainly has been one long-felt in the industry, the promulgation of the new SG standard for passenger car motor oils has clearly increased the market value of a dispersant with viscosity index modifying properties, and the compositions containing the dispersants within the parameters of the '435 Patent thus do appear to fill a significant need in the industry.

### Enablement

■ Exxon further defends against the demand for injunctive relief by contending that the '435 Patent fails adequately to disclose the method for calculating the succination ratio. This Court finds that the evidence presented to date does not demonstrate that Exxon is likely to prevail on this claim. In light of the clear language of the patent claims and specifications, one ordinarily skilled in the art would be able to calculate the ratio from the disclosures of the patent.

Furthermore, as discussed hereinabove in relation to the facts relative to infringement, it is apparent that Exxon has not presented evidence from which it appears likely that it will be able to prove that the content, including the definitions, of the examples of the '435 Patent are inconsistent with the remainder of the specifications or with the claims. Specifically, the use of the words "residue is ... acylating agent" in the examples does not render the examples inconsistent with the specifications or claims.

### Inequitable Conduct

■ Exxon further defends against the demand for injunctive relief on the ground that the inventors of the compositions claimed in the '435 Patent engaged in inequitable conduct in procuring the patent, first by failing to inform the Patent Examiner of the sales of LZ570, and, in addition, by misleading the Patent Examiner in regard to the Okamoto Patents and other prior art references. In particular Exxon complains of the representations made by the inventors to the Patent Examiner after the initial rejection of the patent as being obvious, that the Okamoto patents make no suggestion of acylating agents having an average of at least 1.3 succinic groups for each equivalent weight of substituent groups as required in the invention of the '435 application. The Patent Examiner accepted this representation and the application was eventually approved and the patent issued.

From the evidence adduced at the hearing the Court finds that LZ570 is less pertinent to the subject matter of the '435 Patent than other prior art cited by the applicants, specifically because LZ570 is not a lubricating composition nor is it for use in a lubricating composition. In light of the findings set out hereinbefore relative to all of the prior art references, the Court finds that the evidence has not shown that Lubrizol's assignors failed to disclose any material prior art or made any intentionally misleading representations to the Patent Examiner.

### IRREPARABLE HARM

■ From the evidence presented, it is clear that the promulgation of the new SG standard for passenger car motor oils will have a significant impact on competition for market share among lubricating oil additive suppliers. The evidence demonstrates that Lubrizol's ability to compete has been and will continue to be adversely impacted by Exxon's use of ECA 10444 in its additive products, marketed as the Paranox 600 and Paranox 300 packages, because with these products on the market, Lubrizol's 8800 Series, which contain the

compositions claimed in the '435 Patent, are no longer unique. The evidence further demonstrates that because Lubrizol is itself unique among suppliers of oil additives in that it is not an oil company, but must obtain its raw materials from the very suppliers which are Lubrizol's customers for its finished products, Lubrizol is not in a position to compete effectively on price alone, but must maintain its competitive edge through innovation and the production of superior product. Finally, the evidence demonstrates that any loss of market share incurred during the period of reformulation of oils by lubricating oil suppliers to meet the new SG standard is likely to be of at least several years duration, and not merely a temporary loss. Thus, money damages are not adequate to redress the injury to Lubrizol.

## BALANCE OF HARDSHIPS

From the evidence presented to date, the potential injury to Exxon as a result of its being enjoined from producing and selling the accused lubricating compositions cannot be said to approach the injury to Lubrizol if the injunction does not issue. The testimony revealed that Exxon presently has a non-infringing product which qualifies under the new SG standard, and Exxon projects that it will be able, within a period perhaps as brief as one month, to have on the market SG qualified additives. Clearly any injury to Exxon would be merely temporary in duration, and would be far less in total impact than the harm to Lubrizol if Exxon is not enjoined. In addition the evidence presented suggests strongly that Exxon proceeded with the marketing of ECA 10444 in the face of specific knowledge that Lubrizol accused the product of infringing the '435 Patent and would continue through this suit which had been pending for several years to seek affirmative relief from the claimed infringement; despite this knowledge Exxon took no steps to protect itself against the financial injury which it now projects should the injunction issue, but has continued to develop its new

SG qualified products on the accused ECA 10444. Thus the injury to Exxon, if any, is largely self-inflicted.

## THE PUBLIC INTEREST

[11] It may be that the issuance of the preliminary injunction sought by Lubrizol would have some adverse impact, at least temporarily, on the additive market generally, and thus on the consumer public, as Lubrizol and others move to expand production to cover the share of the market presently held by Exxon's accused products. However, the evidence presented satisfies this Court that the capacity to expand sufficiently is there, in Lubrizol and others, and even if there should be some temporary shortage of "SG" qualified products as a result of this injunction, this temporary harm must be weighed against the public's interest in protecting the integrity of the patent system. It is difficult to see, and the evidence in this case has not established, in what way the public interest is better served by permitting an infringer to profit at the expense of the holder of a patent, than by enforcing the exclusive patent rights and enjoining the infringement.

## BALANCING THE EQUITIES

Exxon raises by way of defense to the motion for preliminary injunction the failure of Lubrizol to fully disclose during the course of discovery the facts on which Lubrizol bases its claim that unreacted polisobutylene is not included in the calculation of succination ratio, and posits that Lubrizol ought now to be estopped from demonstrating that the accused Exxon product infringes when its succination ratio is so calculated. The evidence presented by Lubrizol, however, demonstrates that the language of the specifications and claims of the '435 Patent does not include the unreacted polyisobutylene in the acylating agent, that it is the succination ratio of the acylating agent which is key to the claims of the patent, and that the patent is suffi-

ciently clear, concise and exact in its terms to permit one skilled in the art to make the product. It appears to the Court that Exxon's claim of unclean hands in this regard can only be found to have merit if Exxon's underlying premise is accepted, *i.e.* that the patent by its clear language does not exclude the unreacted polyisobutylene in making the necessary calculations. This premise has been demonstrated to be false.

## LICENSE

Although Exxon has raised the defense of license in its Brief in Opposition to the Motion for Preliminary Injunction, no evidence relevant to this defense was adduced at the hearing. Accordingly, the Court will not address this issue.

## II. CONCLUSIONS OF LAW

### STANDARDS FOR ISSUING PRELIMINARY INJUNCTION

As they relate to this patent infringement case, Lubrizol must establish each of the following elements to obtain a preliminary injunction:

1. a reasonable likelihood that Lubrizol will succeed on the merits regarding the validity of the '435 Patent and the fact of infringement;

2. Lubrizol will suffer irreparable injury if the injunction does not issue;

3. the injury to Lubrizol outweighs the harm the injunction may inflict on Exxon; and

4. the granting of a preliminary injunction is in the public interest.

*Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1269 (Fed.Cir.1985).

In considering these elements, no one element is dispositive of whether the preliminary injunction should issue. *Id.* at 1269 n. 2. "Equity requires that ... each [element] be weighed and measured against others and against the relief demanded." *Id.*

## INFRINGEMENT—BURDEN OF PROOF

Whether a preliminary injunction will issue turns on the plaintiff's ability to demonstrate a reasonable likelihood that it will meet its burden of proof at trial on the issue of patent infringement. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987). The law does not require the plaintiff to prove infringement beyond all question, nor does it require that there be no evidence to support the position of the alleged infringer. *Id.* The plaintiff has the burden of proving infringement at trial by a preponderance of the evidence. *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985). Thus, for an injunction to issue in the instant case, Lubrizol must demonstrate a reasonable likelihood that at the trial on the merits it can prove by a preponderance of the evidence that Exxon's products infringe claims 1, 35, and 41 of the '435 Patent.

Generally, "a finding of infringement depends on whether the accused [product] falls within the scope of the asserted claims as properly interpreted." *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). This determination requires a two step process. "The patented invention as indicated by the language of the claims must be defined (a question of law), and then the trier must judge whether the claims cover the accused device (a question of fact)." *Id., citing, Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *SSIH Equipment S.A. v. United States International Trade Commission*, 718 F.2d 365, 375 (Fed.Cir. 1983). (*See also Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed.Cir. 1987), *cert. denied* —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988), and the cases cited therein.) With respect to the legal aspect of this inquiry, the Court must first turn "to the words of the claim which define the metes and bounds of the invention." *Envirotech, supra* 730 F.2d at 759. Words in a claim "will be given their ordinary and accustomed meaning, unless it appears that the inventors used them differently." *Envirotech, supra* 730 F.2d at

759, *citing Universal Oil Products Co. v. Globe Oil & Refining Co.,* 137 F.2d 3, 6 (7th Cir.1943), *aff'd,* 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944).

Further, patent law "allows the inventor to be his own lexicographer." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985), *quoting Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 397 (1967). To determine the true meaning of the language of the claims, the Court should look to the claims at issue, the specifications, the prosecution history, and the other claims in the patent. *Loctite Corp., supra* 781 F.2d at 867; *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988). Claims should be construed as they would by those of ordinary skill in the art. *Fonar Corp., supra* 821 F.2d at 631. Thus, "[e]xpert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Id., citing Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657 (Fed.Cir.1986); *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 671 (Fed. Cir.), *cert. denied* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

The specification also aids in determining the meaning and the scope of the words used in the claims "inasmuch as words must be used in the same way in both the claims and the specifications." *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed.Cir.1988). Moreover, "the ordinary meaning of claim language, however, is not dispositive and resort must be had to the specification and prosecution history to determine if the inventor used the disputed terms differently than their ordinary accustomed meaning." *Id.* at 1580. The use of the specification as a concordance for the terms in the claims is a basic concept of patent law accepted by virtually all courts. *McGill, supra,* 736 F.2d at 674, *citing Autogiro, supra* 384 F.2d at 397–98. It is another principle of patent law that particular limitations or embodiments appearing in the specification

will not be read into the claims. *Loctite, supra* 781 F.2d at 867.

## VALIDITY—BURDEN OF PROOF

Lubrizol must also demonstrate, in order to sustain its burden of showing a likelihood of success on the merits, that it is likely to succeed relative to the question of the validity of the patent in suit. A patent is presumed to be valid, 35 U.S.C. § 282, and since the ultimate burden regarding validity is on the one challenging the patent to demonstrate by clear and convincing evidence that the patent is invalid, the burden on Lubrizol at the preliminary injunction stage is to show that Exxon is not reasonably likely to be able to prove invalidity. *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). In practical effect, therefore, at the hearing on the motion for the preliminary injunction, Exxon must present clear and convincing evidence of invalidity. *Augat, Inc. v. John Mezzalingua Associates, Inc.,* 642 F.Supp. 506 (N.D.N.Y.1986).

Where the challenge to the patent's validity is based on the prior art, and no prior art other than that which was considered by the patent examiner is relied on by the challenger, the challenger has the added burden of overcoming the deference due a qualified governmental agency presumed to have properly done its job. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.) *cert. denied* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). However, when the challenger relies on prior art or other evidence not considered by the patent examiner, no such deference is due in regard to the prior art not so considered, *Id.,* and the submission of pertinent prior art not considered by the patent examiner neither weakens the presumption of validity nor alters the burden of proof; however the submission of prior art which is more pertinent than that considered by the patent examiner may facilitate the proving of in-

validity by the challenger. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

## VALIDITY—ANTICIPATION

■■■ Anticipation is measured with respect to the terms of the claims in issue, *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771–772 (Fed.Cir.1983), *cert. denied* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed. 2d 687 (1984), and a single reference must show each and every element as set forth in the claim in order to anticipate. *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988).

In deciding the issue of anticipation, the trier of fact must identify the elements of the claims, determine their meaning in light of the specification and prosecution history, and identify corresponding elements disclosed in a single reference. *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984).

One challenging the validity of a patent on the basis of its having been "on sale" in the United States for more than one year prior to the filing of the United States application for that patent, 35 U.S.C. § 102(b), must establish by clear and convincing evidence that a sale or offer for sale of the claimed invention occurred more than one year before the application for the subject patent. *UMC Electronics Co. v. U.S.*, 816 F.2d 647 (Fed.Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 748, 98 L.Ed. 2d 761 (1988).

## VALIDITY—OBVIOUSNESS

35 U.S.C. § 103 prohibits the obtaining of a patent where the differences "... between the subject matter sought to be pat-

ented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains." The requisite analysis of this "obviousness" issue was set forth by the United States Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failures of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

Where the validity of a patent is challenged on the basis of obviousness over a combination of separate prior art references, the Court must determine:

> (a) whether a combination of the teachings of all or any of the references would have suggested (expressly or by implication) the possibility of achieving further improvement by combining such teachings along the line of the invention in suit, and (b) whether the claimed invention achieved more than a combination which any or all of the prior art references suggested, expressly or by reasonable implication.

*In re Sernaker*, 702 F.2d 989, 994 (Fed. Cir.1983).

■■■ Obviousness, however, cannot be established by combining the teachings of the prior art unless the prior art contains some teaching, suggestion or incentive which would have led one skilled in the art to combine the relevant teachings of those prior art references. *Ashland Oil,*

*Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 297 (Fed.Cir.1985), *cert. denied* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed. 2d 315 (1986). It is not permissible to pick and choose only so much of any given reference as will support a given position and ignore the reference in its totality. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 448 (Fed.Cir. 1986), *cert. denied* —— U.S. ——, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). Nor may the claims of the patent in suit be used as a blueprint and abstracted individual teachings from the prior art references be used to create the invention of the patent in suit. *Ashland Oil, Inc. v. Delta Resins, supra.*

■■■■■ It is the obviousness or nonobviousness of the subject matter of the claimed invention *as a whole* which must be the focus of the inquiry, not whether the invented product itself was obvious at the time of its invention, and unexpected or surprising results may be strong evidence of nonobviousness. *Lindemann, supra* 730 F.2d at 1461.

All evidence bearing on the issue of obviousness, specifically including the objective evidence of nonobviousness, *i.e.* the "secondary considerations" of *Graham v. Deere* must be considered and evaluated before the legal conclusion relative to obviousness is reached. *W.L. Gore, supra* 721 F.2d at 1555.

### VALIDITY—35 U.S.C. § 112

The clear language of § 112 requires that the "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same ..." [underlining added].

■■■■■ Enablement is measured with respect to the methods used by persons of ordinary skill at the time the application was filed, and technology subsequently developed cannot render nonenabling or indefinite that which was enabling and defi-

nite at the time the invention was filed. *W.L. Gore, supra* 721 F.2d at 1556–57. A patent will not be held to be nonenabling because of a need for experimentation as long as the experimentation required is not undue. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1576 (Fed.Cir.1984).

### ENFORCEABILITY—INEQUITABLE CONDUCT

■■■■■ Inequitable conduct requires proof by clear and convincing evidence of the threshold of both materiality and intent, and materiality does not presume intent, which is a separate and essential component of inequitable conduct. Absent intent to withhold, it is not controlling whether the reference is found to anticipate or otherwise be material, and therefore, inequitable conduct cannot lie when the failure to disclose the prior art or information did not result from an intent to mislead the patent office. *Allen Organ Co. v. Kimball International, Inc.,* 839 F.2d 1556, 1567 (Fed.Cir.1988).

PTO Rule 1.56(a) explains materiality, stating that information "is material where there is [1] a *substantial likelihood* that [2] a *reasonable examiner* [3] would consider it *important* [4] in deciding *whether to allow the application to issue* as a patent." *American Hoist, supra* 725 F.2d at 1362. The *American Hoist* court found this PTO standard to be an appropriate starting point for any discussion of materiality because it is the broadest and encompasses the other standards of materiality, *i.e.* the objective "but for" standard, the subjective "but for" standard, and the "but it may have" standard.

### IRREPARABLE INJURY

A "strong showing" of the likelihood of success on validity and infringement by the patentee results in a presumption of immediate irreparable harm. *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.) *cert. denied* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). A showing of a "reasonable likelihood" of

success on validity and infringement by the patentee requires that the patentee also make "separate showings of irreparable injury, favorable balance of injury, and the public interest, to justify the grant of a motion for preliminary injunction against patent infringement." *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1272 (Fed.Cir.1985).

A loss of market share as a result of continued infringement has been found to constitute irreparable harm. *John Fluke Manufacturing Co. v. North American Soar Corp.*, 5 U.S.P.Q.2d 1657, 1662 (D.N.J.1987) [available on WESTLAW, 1987 WL 46372].

### BALANCE OF HARDSHIPS

In weighing the harm to the patentee against the potential harm, in the event the injunction issues, to the accused infringer, the Court must look to the nature and cause of that harm, and may take into consideration the infringer's knowledge of the patent and its infringement. *Pittway v. Black & Decker*, 667 F.Supp. 585 (N.D.Ill.1987).

### PUBLIC INTEREST

Public policy clearly favors protection of rights secured by valid patents. *Smith International, supra* 718 F.2d 1581.

### CONCLUSION

Applying the law to the facts as this Court finds them to be from the evidence before it, the Court holds that:

1. Lubrizol has demonstrated by at least a preponderance of the evidence that Exxon's ECA 10444 infringes claims 1, 35 and 41 of the '435 Patent.

2. Exxon has failed to demonstrate by clear and convincing evidence that any single prior art reference brought to the Court's attention, either a patent in existence or a product "on sale" at the time that the application for the '435 Patent was filed, contained each element of the invention of the '435 Patent. The '435 Patent has not been shown to have been anticipated by any of those prior art references.

3. Exxon has failed to demonstrate by clear and convincing evidence that the subject matter of the '435 Patent as a whole would have been obvious to one of ordinary skill in the art at the time the '435 Patent was applied for, in light of the scope and content of the relevant prior art, the differences between that prior art and the '435 Patent, the secondary considerations of commercial success and market need, and the unexpected benefits of the '435 invention.

4. The evidence does not support a finding that the '435 Patent is either inconsistent internally between the language of the specifications and the language of the claims, or non-enabling due to failure to disclose the precise formula for determining succination ratio.

5. The evidence does not support a finding that the applicants for the '435 Patent engaged in inequitable conduct by intentionally failing to disclose to the patent examiner material prior art.

6. Lubrizol has therefore sustained its burden of demonstrating a reasonable likelihood of prevailing on its claim that Exxon will not, in the trial on the merits, be able to establish by clear and convincing evidence that the '435 Patent is invalid.

7. Although the Court believes that Lubrizol has, in fact, made a strong showing that the '435 Patent has been infringed and that Exxon will not be able to prevail on its challenge to the patent's validity, and thus, that the irreparable harm to Lubrizol may be presumed, the Court specifically holds that Lubrizol has demonstrated that Exxon's continued production and sale of ECA 10444 will result in irreparable harm in the form of loss of market share; that that harm is not adequately compensable by money damages; and that the harm to Lubrizol greatly exceeds the harm to Exxon, should it be enjoined from further production and sale of the accused products.

8. The public interest is best served in this case by the issuance of the prelimi-

nary injunction sought by Lubrizol, and the concomitant protection of the patent process.

Accordingly, the Court finds that the motion of Lubrizol for a preliminary injunction is well taken and should be GRANTED.[3]

IT IS SO ORDERED.

## ORDER

A hearing having been held before this Court on May 13, 16, 17, 18 and 19, 1988, on the Motion for Preliminary Injunction filed herein by Plaintiff Lubrizol Corporation, and the Court having issued its Memorandum of Decision, for all of the reasons set forth therein the Court hereby finds that:

1. Lubrizol has demonstrated by at least a preponderance of the evidence that Exxon's ECA 10444 infringes claims 1, 35 and 41 of the '435 Patent.

2. Exxon has failed to demonstrate by clear and convincing evidence that any single prior art reference brought to the Court's attention, either a patent in existence or a product "on sale" at the time that the application for the '435 Patent was filed, contained each element of the invention of the '435 Patent. The '435 Patent has not been shown to have been anticipated by any of those prior art references.

3. Exxon has failed to demonstrate by clear and convincing evidence that the subject matter of the '435 Patent as a whole would have been obvious to one of ordinary skill in the art at the time the '435 Patent was applied for, in light of the scope and content of the relevant prior art, the differences between that prior art and the '435 Patent, the secondary considerations of commercial success and market need, and the unexpected benefits of the '435 invention.

4. The evidence does not support a finding that the '435 Patent is either inconsistent internally between the language of the specifications and the language of the claims, or non-enabling due to failure to disclose the precise formula for determining succination ratio.

5. The evidence does not support a finding that the applicants for the '435 Patent engaged in inequitable conduct by intentionally failing to disclose to the patent examiner material prior art.

6. Lubrizol has therefore sustained its burden of demonstrating a reasonable likelihood of prevailing on its claim that Exxon will not, in the trial on the merits, be able to establish by clear and convincing evidence that the '435 Patent is invalid.

7. Although the Court believes that Lubrizol has, in fact, made a strong showing that the '435 Patent has been infringed and that Exxon will not be able to prevail on its challenge to the patent's validity, and thus, that the irreparable harm to Lubrizol may be presumed, the Court specifically holds that Lubrizol has demonstrated that Exxon's continued production and sale of ECA 10444 will result in irreparable harm in the form of

---

**3.** On June 17, 1988, the Court was hand-delivered from Exxon United States Patent 4,695,390, marked by Exxon as DX 114, with a letter request from Exxon that the Court take judicial notice of this patent and add it to the record on the pending motion for preliminary injunction. Exxon's letter posits that this '390 Patent contradicts the position of Lubrizol relative to the proper method of calculating succination ratio under the '435 Patent. While the Court has no objection to taking judicial notice of the existence of the patent, it is entirely improper that any such notice be taken of the teachings of this patent. Additionally, no testimony or admissible evidence has been presented to the Court in relation to this patent.

The Court would note however that, having received the '390 Patent, we have carefully reviewed it and find that nothing contained in this patent makes it any less likely that Lubrizol will be able to sustain its burden of proof at trial on the issues herein. In particular, the Court notes, for example, that claim 1 of the '390 patent states "An oil soluble dispersant composition comprising: the reaction product of (A) at least one polycarboxylic acid acylating agent having at least one polyalkene substituent having an $M_n$ value of about 300 to about 5,000 and a $M_w$ value of about 500 to about 2,000 with (B) a polyamine and (C) a sulfolene, said acylating agents having within their structure an average of at least 0.5 acylating groups for each equivalent weight of said polyalkene group, said reaction being conducted at a temperature from about 15° C. to about 300° C." [underlining added]

loss of market share; that that harm is not adequately compensable by money damages; and that the harm to Lubrizol greatly exceeds the harm to Exxon, should it be enjoined from further production and sale of the accused products.

8. The public interest is best served in this case by the issuance of the preliminary injunction sought by Lubrizol, and the concomitant protection of the patent process.

It is therefore ORDERED, ADJUDGED and DECREED:

I. That Exxon Corporation, its subsidiaries, divisions and affiliates, and their directors, officers, agents, servants, representatives, employees, attorneys, successors and assigns, and all persons in active concert or participation with any of them who receive actual notice of this Preliminary Injunction Order by personal service or otherwise, are enjoined:

A. from making, having made, using, selling or offering for sale, in the United States, any lubricating composition or lubricant additive containing its product ECA 10444 including Superflo High Performance, Paranox 300 and Paranox 600, and from supplying in or from the United States any lubricant additive containing its product ECA 10444, including Paranox 300 and Paranox 600, for combination in a lubricating composition outside the United States (35 U.S.C. §§ 271(f)(1) and (2)).

B. from making, having made, using, selling or offering for sale, in the United States, any lubricating composition or lubricant additive which:

1. contains the reaction product of a polyisobutenyl-substituted succinic acid or anhydride and an amine characterized by the presence within its structure of at least one $H-N<$ group, alcohol or any combinations thereof, in whatever order reacted;

2. wherein the polyisobutenyl substituent group is derived from a polyisobutene characterized by a number average molecular weight of 1300 to about 5,000;

3. in which said polyisobutene is further characterized by a ratio of weight average molecular weight to number average molecular weight of about 1.5 to about 4;

4. in which said polyisobutenyl-substituted succinic acid or anhydride is characterized by the presence within its structure of at least 1.3 succinic groups for each equivalent weight of substituent groups; and

5. in which said reaction product of subparagraph 1., above, characterized as above in sub-paragraphs 2, 3 and 4, may or may not be post-treated by boration.

C. from making, having made, using, selling, or offering for sale, in the United States, and from supplying in or from the United States for combination in a lubricating composition outside the United States (35 U.S.C. §§ 271(f)(1) and (2)), any concentrate for formulating lubricating compositions comprising from about 20% to about 90% by weight a normally liquid, substantially inert organic solvent/diluent and from about 10% to about 80% by weight of at least one reaction product characterized as above in sub-paragraphs B1, B2, B3, B4 and B5.

II. That this Order shall continue in full force and effect until final judgment is rendered in this action.

III. That The Lubrizol Corporation shall post a bond in the amount of $100,000, in a form to be approved by the Court, conditioned for payment of such damages and expenses upon order of the Court as may be incurred by Exxon Corporation if Exxon Corporation is found to have been wrongfully enjoined.

IT IS SO ORDERED.